UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HERBERT GARY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:04-cv-0161-DFH-WTL |
| | ) | |
| CARRIER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Herbert Gary is a current employee of defendant Carrier Corporation ("Carrier").  Gary is African American and claims that he received a five-day suspension because of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981").  Carrier has filed a motion for summary judgment.  For the reasons explained below, defendant's motion is denied as to Gary's discrimination claims but granted as to his claims that defendant retaliated against him in violation of Title VII and Section 1981 for pursuing arbitration and/or bringing an EEOC charge against the company.  Plaintiff has withdrawn the retaliation claims in response to the summary judgment motion.  See Pl. Br. at 1 n.1.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Only genuine disputes over material facts can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id.*

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. See *Anderson*, 477 U.S. at 255; *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999). However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record. *Anderson*, 477 U.S. at 251-52; *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001).

*Facts For Summary Judgment*

By moving for summary judgment, the defendant has asked the court to apply the law to only the plaintiff's version of these contested events. The following account of the relevant facts therefore is not necessarily accurate. It is the plaintiff's version of the events, giving him the benefit of all conflicts in the evidence and any reasonable and favorable inferences from the evidence. Adverse facts established beyond reasonable dispute by the defendant are necessarily included in the narrative.

I.     *Gary's Employment History at Carrier*

Plaintiff Herbert Gary was hired by defendant Carrier Corporation in 1992 to work as an assembler in its Indianapolis manufacturing facility. Gary Dep. at 22, 26. Gary also has worked as a brazer and, when he filed this lawsuit, worked as a fabrication technician for Carrier in the same facility. *Id.* at 27-28. In 2003, the United Steelworkers of America – Local 1999 ("the Union") represented 1550 employees at Carrier's Indianapolis facility, including Gary. Pendleton Aff. ¶ 4; Gary Dep. at 24. Gary is African American.

Before the 2003 incident at issue in this case, Gary had received several disciplinary actions, including three prior terminations that were later rescinded. Because Gary has withdrawn his retaliation claims, the court does not discuss these in full detail. In approximately 1997, Carrier terminated Gary for excessive

points under its attendance plan.  Gary Dep. at 33, 103-06.  Gary testified that Carrier kept points in his record that related to absences for doctor visits.  *Id.* at 34-35.   Gary filed a grievance with the Union and a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC").  *Id.* at 34, 103-06, Ex. 11.  Carrier reinstated Gary with full back pay.  *Id.* at 34-35.

In approximately 1997 or 1998, Carrier terminated Gary again for working for another employer during a medical leave of absence, in violation of company policy.  Gary Dep. at 35-36, Ex. 1 (Plant Rule 16).  Gary had worked for the National Guard while recovering from throat surgery.  *Id.* at 36-37.  Gary filed a grievance with the Union and sought assistance from the United States Department of Veterans Affairs.  *Id.* at 37-39, 43, 100-01.  Carrier ultimately reinstated Gary with full back pay.  *Id.* at 37, 39.

In April 2001, Gary was terminated a third time, that time for interfering with production by leaving his production line.  See Gary Dep. at 41, 45-46, Ex. 2.  Gary filed a grievance over his termination and an arbitration hearing was held in December 2002.  *Id.* at 43, 46-48, Exs. 3 & 4.  In 2003, an arbitrator reduced Gary's termination to a ten-day suspension.  Carrier reinstated Gary with full back pay, except for the period of suspension.  *Id.* at 43-44.

II.   *Carrier's Policies*

The focus of this case is an incident in May 2003 when Gary left the plant and had lunch in his car in the parking lot.   During his employment, Gary received a copy of Carrier's associate handbook, which contains a list of plant rules.  Gary Dep. at 24-26.  The handbook specifies that Carrier may immediately discharge an employee for walking off the job or out of the work area without authorization.  See *id.* Ex. 1 (Plant Rule 9).  The handbook also specifies that an employee may be discharged for falsifying company documents or committing related acts, such as ringing in or out on another employee's identification badge. See *id.* Ex. 1 (Plant Rule 10).

When leaving the building, employees must swipe an identification badge through a turnstile located outside the plant.  Gary Dep. at 50-52.  Carrier claims that it also requires employees leaving the plant to clock in and out at a time clock.  Pendleton Aff. ¶ 8.  Carrier's monthly newsletter contained warnings in at least its January, July, and November 2002 issues that employees were to clock in and out when leaving the building for lunch and that they could face disciplinary action if they did not.  Pendleton Supp. Aff. ¶¶ 16-18, Exs. J, K, & L.

Gary testified that Carrier had an unwritten policy that employees did not need to clock out for lunch breaks if they were staying on company premises such as the company parking lot and outside picnic tables.  Gary Dep. at 55.  Gary testified that he believed this was the accepted practice based on his interactions

and communications with co-workers over the years.  Gary Decl. ¶ 1.  Gary acknowledges that this practice was not in writing and that no member of Carrier management ever told him about such a practice.  Gary Dep. at 56, 81, 95.

Gary testified that on a few occasions prior to May 13, 2003, he ate lunch in his car on company property without clocking in or out and was not disciplined or advised that he had violated company policy.  Gary Decl. ¶ 3.  Gary testified that others, including African American employees, sometimes left the plant without clocking out and were not disciplined.  Gary Dep. at 96.  Union President Crystal Harris testified that Carrier started directing employees to clock in and out for lunch breaks only after May 2003.  Harris Decl. ¶ 19.

III.    *Gary's May 2003 Incident and Related Discipline*

On May 13, 2003, Gary worked the first shift at Carrier.  Gary admits that he left work two or three minutes before the beginning of his designated lunch period and failed to clock out.  Gary Dep. at 49-50, 52-53.  Gary testified that he ate his lunch while sitting in his vehicle in the company parking lot.  *Id.* at 53-54.  Gary swiped his identification badge through the turnstile when both exiting and returning.  *Id.* at 52-53.

Gary returned inside the plant after lunch.  Several hours later, Gary's supervisor, Dennis Juelfs, instructed him to report to the Human Resources office.  Gary Dep. at 56.  Gary met with Union President Crystal Harris, Carrier human

resources representative Bernita Townsend, and supervisor Kevin Howard. *Id.* at 57, 61. Townsend and Howard informed Gary that they learned he had left early for lunch and failed to clock out. *Id.* at 58. Howard stated that someone reported seeing Gary leave company property, but Gary denied that he left the parking lot. *Id.* at 58-59, 66-67.

Gary told the group that Juelfs had previously told him and other employees that they could leave a few minutes early for breaks. Gary Dep. at 58-61; Harris Decl. ¶ 8. After the meeting, but prior to Gary's termination, Juelfs confirmed to Harris that he had said this. Harris Decl. ¶ 11. Juelfs testified that he intended this authorization to be limited to the employees' shorter breaks, see Juelfs Aff. ¶¶ 6-8, but Gary understood it to extend to the lunch break as well.[1]

Gary also told Townsend and Howard that two other employees left with him at the same time and did not clock in or out. Gary Dep. at 51-53, 83-85. Gary has identified these employees as George Gann and Ryan Vaughn, both Caucasian. *Id.* at 51-52, 84-85, 153. Gary testified that Gann and Vaughn ate their lunches in a car parked near his. *Id.* at 54. Gary remembers providing Townsend and Howard with Gann's name, but he did not know Vaughn's name at the time. Gary Decl. ¶ 6; Gary Dep. at 85; see also Harris Decl. ¶ 9. Townsend

---

[1] Hearsay testimony about Juelfs' statements is admissible as a party admission because his statements are offered against a party (Carrier), were made during his employment relationship with Carrier, and concern a matter within the scope of his employment. See Fed. R. Evid. 801(d)(2)(D).

and Howard told Gary that he would be suspended pending further investigation. Gary Dep. at 59, 61.

Shortly after this meeting, human resources manager Rejeana Pendleton told Union President Harris that the turnstile history report confirmed that both Gann and Vaughn had left early for lunch without clocking out at the same time and out of the same exit as Gary.  Harris Decl. ¶ 10.[2]  Gann and Vaughn were not disciplined for any rule violations.

On or about May 30, 2003, Gary received a letter from Townsend stating that he was suspended indefinitely for violating Plant Rules 9 and 10.  Gary Dep. at 74-76, Ex. 5.  Carrier claimed that Gary's first violation related to the fact that his supervisor did not know his whereabouts prior to lunch, and that his second violation was his failure to clock in or out for lunch.  *Id.*; Harris Decl. ¶ 14. Pendleton told Harris that she had suggested that Gary only be suspended, in part because of Juelfs' statement.  Harris Decl. ¶ 12; Pendleton Supp. Aff. ¶ 13.

The Union filed a grievance on Gary's behalf.  Gary Dep. at 63, 76, Ex. 6. Gary filed an unfair labor practice charge with the National Labor Relations Board alleging retaliation for filing and pursuing a grievance to arbitration, but he withdrew this charge when the Board notified him that it did not intend to pursue

---

[2]Pendleton's statements also fall within the party admission exception to the hearsay rule.  See Fed. R. Evid. 801(d)(2)(D).

his claim. *Id.* at 124-25, 127-29, Exs. 17 & 18.  Gary also filed a charge with the EEOC on or about June 6, 2003.  *Id.* at 82-83, 115, Ex. 14.  In Gary's EEOC charge questionnaire, he stated that employees did not need to clock out if they remained on company property.  *Id.* at 119, Ex. 15.

On the same day that Gary left the plant early for lunch and without clocking out, two Caucasian employees – James Taft and Kenneth Baker – did the same but through a different door.  Pendleton Aff. ¶¶ 9, 10; Gary Dep. at 65-66; Gary Decl. ¶ 8.  Taft and Baker were suspended pending an investigation and received letters on May 30, 2003 confirming their suspensions as well.  Pendleton Aff. ¶¶ 11, 13; Gary Dep. at 70.  The Union also filed grievances on behalf of Taft and Baker.  Pendleton Aff. ¶ 12.  At the time that Gary submitted his EEOC charge, he was not aware that Carrier had suspended Baker and Taft.  Gary Dep. at 64-65, 83.

On or about June 9, 2003, Gary received a letter from Townsend that he was being terminated for violating Plant Rules 9 and 10.  Gary Dep. at 64, 77, Ex. 7.  Taft and Baker received similar letters on the same day.  Pendleton Aff. ¶ 14, Exs. E & F.

IV.    *Post-Termination Events*

The Union filed termination grievances on behalf of Gary, Taft, and Baker. Gary Dep. at 70-71, 78, Ex. 8; Pendleton Aff. ¶ 15.  On June 18, 2003, Gary filed

an amended charge with the EEOC asserting a claim of race discrimination.  Gary Dep. at 110-12, Ex. 13.  Gary alleged that Carrier failed to discipline similarly-situated Caucasian employees.  See Gary Dep. Ex. 13.  Gary received a right-to-sue letter from the EEOC on October 31, 2003.  *Id.* at 123-24, Ex. 16.

Carrier met with the Union to discuss the grievances of Gary, Taft, and Baker.  Pendleton Aff. ¶ 16.  The Union agreed to withdraw its grievances and Carrier agreed to reduce all three terminations to suspensions.  Pendleton Aff. ¶ 17; Gary Dep. at 71-72.  Gary, Taft, and Baker were reinstated and provided back pay, except for their respective suspension periods.  Pendleton Aff. ¶ 18; Gary Dep. at 73.  Gary and Baker were each suspended for five days; Taft was suspended for ten days.  Harris Decl. ¶ 16, Exs. A1-C2.  Gary is still employed by Carrier but his five-day unpaid suspension remains part of his personnel file.  Pendleton Aff. ¶ 19.

## Discussion

Gary alleges that Carrier discriminated against him based on his race when it suspended him.  He seeks relief under Title VII and Section 1981.  The applicable legal standards for race discrimination are the same under both of these statutes.  *Williams v. Waste Management of Illinois, Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004).

-10-

Race discrimination can be shown by direct or indirect evidence. *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 728 (7th Cir. 2004). Gary offers no direct evidence of discrimination based on race. See *Jordan v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005) (proving discrimination by direct method requires admission by employer or a "convincing mosaic" of circumstantial evidence pointing directly toward intentional discrimination). He therefore must rely on the indirect method of proving racial discrimination. See Pl. Br. at 15.

To defeat summary judgment by using the indirect method of proof, a plaintiff first must come forward with evidence that would allow a jury to find the elements of a prima facie case of discrimination. If the plaintiff meets this burden, the defendant may rebut the plaintiff's prima facie case by articulating a legitimate, non-discriminatory reason for the employment action. The plaintiff must then present evidence that could allow a reasonable jury to find that the stated reason was not a true reason but a pretext, which may permit in turn an inference of unlawful intent. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004) (applying indirect method of proof to race discrimination claims under Title VII and Section 1981).

To establish a prima facie case of discrimination, Gary must demonstrate that (1) he is a member of a protected class; (2) his performance met Carrier's legitimate expectations; (3) he was subjected to an adverse employment action;

and (4) similarly situated employees of a different race were treated more favorably.  See *McDonnell Douglas*, 411 U.S. at 802-03; *Herron*, 388 F.3d at 299; *Williams*, 361 F.3d at 1034.

I.   *Gary's Prima Facie Case*

Gary has offered evidence of all the elements of a prima facie case of discrimination.  The parties agree that Gary is a member of a protected class and that he suffered an adverse employment action by being suspended for five days without pay.  Carrier contends he cannot show he was meeting its legitimate expectations or that similarly situated employees of a different race were treated more favorably.

With respect to meeting Carrier's legitimate expectations, Gary admits that he left early for lunch and failed to clock in or out.  Gary contends that Carrier did not enforce these requirements with any regularity.  He claims in fact that he was specifically authorized by supervisor Juelfs to leave a few minutes early for lunch breaks.  Gary also claims that, in practice, employees were not required to clock in or out when they stayed on company premises.  Essentially, Gary argues that he has raised a genuine issue of fact as to whether his conduct on May 13th was contrary to Carrier's *legitimate* job expectations.

In cases alleging discriminatory discipline, the plaintiff need not always show that he was a model employee.  An employer may violate Title VII or Section

1981 by disciplining an employee more harshly because of his race. Thus, where a plaintiff alleges discriminatory or retaliatory discipline, "the second and fourth prongs of *McDonnell Douglas* merge." *Lucas*, 367 F.3d at 728, citing *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002), and *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999). In such cases, "there is no question that the employee failed to meet his employer's expectations. Instead, the plaintiff must establish that he received dissimilar – and more harsh – punishment than that received by a similarly situated employee who was outside the protected class." *Lucas*, 367 F.3d at 728, citing *Grayson*, 308 F.3d at 817, and *Flores*, 182 F.3d at 515; see also *Kriescher v. Fox Hills Golf Resort and Conference Center*, 384 F.3d 912, 915-16 (7th Cir. 2004) (prima facie case of discriminatory discharge "includes showing that similarly-situated employees who were outside of her protected class were treated more favorably"), citing *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). It is therefore unnecessary to determine whether Gary was meeting Carrier's legitimate expectations. The court focuses on Carrier's challenge to the fourth element of Gary's prima facie case. Accord, *Grant v. Aztar*, 2005 WL 2035502, *5 (S.D. Ind. Aug. 23, 2005) (employee must come forward with specific evidence meeting fourth element of prima facie case when alleging discriminatory discharge based on race); *Banks v. Archer/American Wire*, 2005 WL 2007227, *12 (N.D. Ill. Aug. 17, 2005) (proceeding to analysis of fourth element of prima facie case where plaintiff alleging race discrimination admitted engaging in conduct that resulted in written warnings).

Gary has met his burden of showing that he received different punishment than a similarly situated employee outside of his protected class. In differential discipline cases, a plaintiff must show that he was situated similarly to another employee with respect to performance, qualifications, and conduct. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000); see also *Lucas*, 367 F.3d at 733. This typically requires a showing that the two employees dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them. *Radue*, 219 F.3d at 617-18.

Gary points to George Gann and Ryan Vaughn as examples of similarly situated non-African American employees who were not disciplined for leaving early for lunch or failing to clock in or out on May 13, 2003. Like Gary, both Gann and Vaughn were hourly employees and members of the Union. See Harris Decl. ¶ 2. According to Gary, both Gann and Vaughn left early for lunch *with Gary* and similarly failed to clock in or out. Like Gary, both Gann and Vaughn ate their lunches while seated in their cars during the lunch period. Because Gary, Gann, and Vaughn engaged in the same conduct at the same time, the three employees were similarly situated.

Carrier offers two arguments in response.  First, Carrier contends that it was unaware that Gann and Vaughn had violated any plant rules.  Although Gary notified management that two employees had been with him when he left for lunch, Carrier claims that Gary did not provide these employees' names and therefore management did not know about their alleged misconduct.  Related to this first argument, Carrier argues that Gann and Vaughn did not deal with the same supervisor as Gary because Plant Manager Phil Grady did not witness them leaving early for lunch, while he personally observed Gary, Baker, and Taft doing so.  Grady Aff. ¶¶ 4-6.

The arguments do not defeat Gary's claim, at least as a matter of law.  First, Gary has raised a genuine issue of fact as to whether he provided at least Gann's name to management in the meeting that took place on May 13th.  Both Gary and Harris testified that he did so.  In addition, according to Harris, Pendleton later confirmed with Harris that Gann's and Vaughn's time badges reflected that they had left the plant early.  Viewing the evidence in the light reasonably most favorable to Gary, he has raised a genuine issue of fact as to whether Carrier managers were aware, prior to his termination, that Gann and Vaughn had violated plant rules by engaging in the same conduct.

Second, Carrier's effort to distinguish Gary from Gann and Vaughn under the "same supervisor" requirement is not persuasive.  The requirement that employees share the same supervisor is important in analyzing adverse

employment actions where the evaluation of employee performance is at least somewhat dependent upon the judgment of one's supervisor. See *Radue*, 219 F.3d at 618 ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently."). In this case, at least according to Carrier, employees were not subject to varying standards on clocking out or leaving for lunch depending on the identity of their immediate supervisors. Carrier management could easily discern whether employees complied with its plant rules by observing employees and/or reviewing their time badge records. Finally, there is an issue of fact as to whether Grady saw Gary leave the plant, but did not see Gann or Vaughn. This issue is discussed below in the context of pretext.

II.    *Pretext Analysis*

Because Gary has established a prima facie case of discrimination, the burden then shifts to Carrier to articulate a legitimate, non-discriminatory reason for disciplining him. Carrier contends that it suspended Gary for violating Plant Rules 9 and 10 by leaving early for lunch and failing to clock in or out. This reason seems at first to be non-discriminatory and legitimate in light of Carrier's interest in maintaining a productive workforce and keeping track of its employees while they are on the job.

Accordingly, the burden then shifts to Gary to present evidence that could allow a reasonable jury to find that Carrier's stated reason was not a true reason, but a pretext, which may permit in turn an inference of unlawful intent. Gary has come forward with evidence that could allow a reasonable jury to conclude that Carrier's reason for disciplining him was pretextual.

A pretext must be more than an unusual act and something worse than a business error; it must amount to deceit used to cover one's tracks. See *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 730 (7th Cir. 2001). An individual attempting to show that a defendant's rationale was pretextual may offer evidence tending to show either that (1) the employer's rationale was factually baseless; (2) the proffered reasons were not the actual motivation for the decision; or (3) the proffered reasons were insufficient to motivate the decision. *Id.* Gary uses the first and second methods to demonstrate pretext, relying on the evidence that Carrier's actual practice did not match its published plant rules, that his supervisor authorized him to leave early, and that Carrier did not enforce the rules against two Caucasian employees who committed the same violations of the published rules at the same time.

Keeping in mind the standards for summary judgment, Gary has met his burden of coming forward with evidence that could allow a reasonable jury to find that Carrier's stated reason for disciplining him was factually baseless and/or was not the real motive for its decision. Again, Carrier's stated reason for terminating

Gary was that he violated Plant Rules 9 and 10.  But this reason does not explain why Carrier disciplined *only* Gary in light of the evidence that two other employees committed the same misconduct and were not disciplined.  See *Flores*, 182 F.3d at 515 (recognizing that issue was whether plaintiff was singled out for discipline because of her race, not whether she violated employer's rules).  Gary has identified a genuine issue as to whether Carrier knew that Gann and Vaughn left early and failed to clock in or out on May 13th.  A showing that "similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination."  *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) (reversing summary judgment for employer on race discrimination claim and noting that employer's proffered justification for plaintiff's termination was weakened by fact that employer did not terminate white employee who had been put into same employee category as plaintiff), quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000); see also *McDonnell Douglas*, 411 U.S. at 804 ("Especially relevant to such a showing [of pretext] would be evidence that white employees involved in acts against petitioner of comparable seriousness . . . were nevertheless retained or rehired."); cf. *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 n.3 (7th Cir. 1998) ("There is no doubt that selective enforcement of company policies against one gender and not the other would constitute sex discrimination under Title VII.").

In its reply brief, Carrier introduces one explanation for the alleged disparity in discipline between Gary on the one hand, and Gann and Vaughn on the other. Carrier contends that Plant Manager Grady actually observed Gary, Baker, and Taft leaving the plant early and without clocking out on May 13th and that he passed this information on to Human Resources.  See Grady Aff. ¶¶ 4, 5.  By contrast, Grady testified that he did not see Gann or Vaughn leave early for lunch or fail to clock out.  Grady Aff. ¶ 6.  However, Grady's testimony that he did not observe Gann or Vaughn leaving the plant is contradicted by Gary's testimony that he left for lunch on May 13th *with* Gann and Vaughn.  Gary testified that the three of them left at the same time and out of the same exit.  Gary also testified that Baker and Taft left out of a different exit.  Viewing the evidence in the light reasonably most favorable to Gary, Gary has offered evidence from which a reasonable jury could conclude that Carrier's stated reason for disciplining him, and not others, was pretextual.  Cf. *Flores*, 182 F.3d at 515-16 (affirming summary judgment in favor of employer on Title VII discrimination claim where employer's proffered reason for firing plaintiff and not others was because plaintiff had "instigated" unauthorized coffee break).

Carrier argues that, even if Gary can establish pretext, he cannot prove intentional discrimination based on race.  Carrier points out that other African American employees and even Gary himself sometimes were not disciplined for leaving early for lunch or failing to clock in or out.  Carrier also points out that Baker and Taft – two Caucasian employees – were suspended for the same reasons

as Gary.  Carrier argues that this evidence demonstrates that any differential discipline on its part was not tied to race, citing this court's decision in *Malone v. Indiana Steel and Wire Corp.*, No. IP 97-977-C H/G, Entry on Cross-Motions for Summary Judgment, at 13-14 (S.D. Ind. May 13, 1999).  In *Malone*, the defendant was fired for "premeditated sleeping" on the job.  The court granted summary judgment for the employer on the race discrimination claim because the undisputed facts showed that the employer honestly believed Malone's sleeping violations were more serious than any other employees' sleeping violations, regardless of their race.  *Malone* is not helpful to Carrier here.

Carrier is correct that Gary ultimately must prove pretext by a preponderance of the evidence and, although the *McDonnell Douglas* approach is often called the "burden shifting" method, the ultimate burden of persuading the jury that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  See *Stockett v. Muncie Indiana Transit System*, 221 F.3d 997, 1001 (7th Cir. 2000), citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The prima facie case, however, is designed to identify situations where the actions taken by the employer, if unexplained, are more likely than not based on consideration of impermissible factors.  *Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995).  Once it is established, the plaintiff need only introduce evidence from which a jury could infer that the employer's offered reason is a pretext, meaning "a dishonest explanation, a lie rather than an oddity or an error."  *Lucas*, 367 F.3d at 731, quoting *Kulumani v. Blue Cross Blue*

*Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000); see also *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-48 (2000) (holding that, in some cases, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated" because "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination"). At that point, the inference of unlawful discrimination is permissible, even if a jury would not be required to draw the inference.

Carrier's failure to discipline Gary and other African Americans at times does not prove the absence of discrimination or defeat the permissible inference, at least as a matter of law. A plaintiff using the indirect method of proving discrimination need not prove that the employer discriminates against every member of the protected class, especially where the employer may not be aware of every violation. Carrier's discipline of Baker and Taft is more relevant. See *Peters*, 307 F.3d at 546 (determining that African American plaintiff had not been singled out for termination similar to plaintiff in *Flores* where Caucasian co-worker was terminated for the same conduct). But this evidence is also not decisive as a matter of law, for Carrier is arguing in effect for adding a new fourth step to the Supreme Court's three-step indirect method of proof. Where an employee has satisfied all elements of the indirect method of proof, an employer is not entitled to summary judgment on the theory that it can identify one or more

-21-

similarly situated individuals outside the protected class who were treated the same as the plaintiff. Such evidence is available to rebut the plaintiff's evidence and to weigh against inferring discriminatory intent, but it does not control the outcome of the case as a matter of law. For example, one reasonable explanation of the evidence might be that Carrier never permitted African Americans like Gary to avoid discipline when caught violating the rules, but sometimes allowed employees of a different race to do so.

Carrier's proffered explanation for its treatment of Gary is also reasonable, especially if a jury believes Carrier's version of the facts here. See, *e.g.*, *Smart v. Int'l Brotherhood of Electrical Workers, Local 702*, 315 F.3d 721, 728 (7th Cir. 2002) (plaintiff could not withstand summary judgment on Title VII discrimination claim because, among other reasons, he could not show pretext where defendant was unaware of similarly situated employees: "An absence of uniform treatment need not be evidence that someone is lying."). However, it is also reasonable to infer from the evidence that Grady saw Gary, Gann, and Vaughn leaving for lunch together and, with discriminatory intent, chose to discipline the only African American employee in the group. At the summary judgment stage, the court is not permitted to choose among competing reasonable inferences. The court must view all of the evidence and reasonable inferences drawn therefrom in favor of the non-moving party. Because Gary has offered evidence from which a jury could find that Carrier's stated reason for disciplining him was pretextual, Carrier's motion for summary judgment on Gary's discrimination claims must be denied.

*Conclusion*

Gary has come forward with evidence establishing a prima facie case of discrimination based on race and has presented evidence from which a reasonable jury could find that Carrier's stated reason for disciplining him was pretextual. Accordingly, defendant's motion for summary judgment (Docket No. 35) is denied with respect to Gary's discrimination claims under Title VII and Section 1981. Defendant's motion is granted with respect to Gary's retaliation claims under Title VII and Section 1981.  The court will contact counsel in the near future to schedule a new trial date.


So ordered.


Date: March 24, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Denise K. LaRue
HASKIN LAUTER LARUE & GIBBONS
dlarue@hlllaw.com

Byron L. Myers
ICE MILLER LLP
byron.myers@icemiller.com